IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SCOTT WOHRMAN | NO.   3:22-cr-267-S |

# FACTUAL RESUME

In support of **Scott Wohrman's** ("**Wohrman**") plea of guilty to the offenses in Counts One and Two of the Information, **Wohrman**, the defendant; Paul Molle and Michael Hursey, the defendant's attorneys; and the United States of America (the government) stipulate and agree to the following:

# ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the Information, charging a violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1) and (2)), that is, Conspiracy to Defraud the United States and to Solicit or Receive Illegal Remuneration, the government must prove each of the following elements beyond a reasonable doubt:

*First*:   That the defendant and at least one other person made an agreement to defraud the government or one its agencies, or to commit the crime of paying or receiving health care kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1) and (2), as charged in the Information;

*Second*:   That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

*Third*:   That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts

described in the indictment, in order to accomplish some object or purpose of the conspiracy.[1]

To prove the offense alleged in Count Two of the Information, charging a violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1), the government must prove each of the following elements beyond a reasonable doubt:

*First*: That the defendant solicited or received remuneration, including any kickback, bribe, or rebate;

*Second*: That the defendant did so in return for referring Medicare beneficiary insurance information, genetic specimens, and completed doctor's orders for the furnishing or arranging for the furnishing of any item or service; and for the purchasing, leasing, ordering, or arranging for and recommending purchasing, leasing, and ordering any good, service, and item;

*Third*: That the item or service was one for which payment was or might be made, in whole or in part, under a Federal health care program; and

*Fourth*: That the defendant acted knowingly and willfully when soliciting or receiving the remuneration.[2]

## STIPULATED FACTS

1.     **Wohrman** admits and agrees that from in or around August 2020, through in or around April 2022, in the Northern District of Texas, Dallas Division, and elsewhere, he knowingly and willfully combined, conspired, confederated, and agreed with Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3, and others, to knowingly and willfully:

---

[1] Fifth Circuit Pattern Jury Instruction 2.15A (2019).

[2] Adapted from Fifth Circuit Pattern Jury Instruction 2.109B (2019).

a. defraud the United States by impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services and the Centers for Medicare and Medicaid Services in their administration and oversight of the Medicare program;

b. solicit and receive remuneration, specifically kickbacks and bribes, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare; and

c. offer and pay remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare.

2. Additionally, **Wohrman** agrees and stipulates that, as set forth in Count Two of the Information, on or about November 12, 2021, **Wohrman** knowingly and willfully solicited and received, directly or indirectly, approximately $860,200 into the AHS x6377 bank account, from a bank account controlled by Co-Conspirator 1, in exchange for genetic specimens, doctor's orders, and personal identifying information from multiple Medicare beneficiaries. **Wohrman** agrees and stipulates that Medicare is a Federal health care program.

3. The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who aged 65 or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries." **Wohrman** admits and agrees that Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

4. American Health Screening LLC ("AHS") was a company based in Indiana that had operations in Indiana and Arizona. AHS purported to market genetic testing to Medicare beneficiaries. AHS maintained an account at the Bank of the West ending in x6377 (the "AHS x6377 account"), among others.

5. **Wohrman** was a part owner and operator of AHS.

**Factual Resume—Page 4**

6. Through AHS, **Wohrman** and others oversaw a network of telemarketers whom they instructed to target Medicare beneficiaries in the Northern District of Texas and elsewhere, to induce those beneficiaries to agree to submit to genetic testing that was medically unnecessary, not provided as represented, and not eligible for reimbursement.

7. If the beneficiary showed interest to the telemarketer, the telemarketer would verify the beneficiary's health insurance benefits and forward the telephone call to a telehealth company, Telemedicine Company 1. A representative of Telemedicine Company 1 would ask additional questions of the beneficiary, including seeking the name and contact information for the beneficiary's primary care physician. Telemedicine Company 1 would then undertake efforts to obtain a signed laboratory test requisition (a "doctor's order") from the beneficiary's primary care physician authorizing genetic testing. Telemedicine Company 1 would send a letter and a pre-filled requisition form to the beneficiary's primary care physician stating that the beneficiary qualified for a genetic test and requesting that the physician sign the requisition form and return it to Telemedicine Company 1.

8. If the requisition order was signed, Telemedicine Company 1 would mail a collection kit to the beneficiary's address. The kit contained step-by-step instructions on how to provide a genetic specimen. The kit was then returned to Telemedicine Company 1 via a prepaid envelope. Once a week, Telemedicine Company 1 would send the completed kits with genetic specimens and doctors'

orders to laboratories, including laboratories controlled by Co-Conspirator 1, which in turn would perform genetic testing (or outsource the testing) and bill Medicare.

9. In exchange for providing the laboratories with doctors' orders and genetic specimens, **Wohrman**, through AHS, received kickbacks and bribes in the form of payments by the laboratories for each beneficiary for which a completed doctor's order and genetic specimen was provided. These payments were deposited into the AHS x6377 account.

10. In or around October 2020, **Wohrman**, Co-Conspirator 1, and Co-Conspirator 2 entered into an agreement under which AHS would submit completed kits with genetic specimens and doctors' orders to laboratories controlled by Co-Conspirator 1. In return, Co-Conspirator 1 would pay AHS kickbacks and bribes into the AHS x6377 account, consisting of payments for every kit received. The parties agreed that a portion of the payment would be made upon receipt of the testing kit, and that the balance would be paid upon Medicare reimbursing Co-Conspirator 1's laboratories for the genetic test.

11. The kickback payments from the laboratories controlled by Co-Conspirator 1 were sent from bank accounts at Bank of America and Hancock Whitney Bank ending in x2168 and x6498, respectively.

12. To conceal the kickbacks and bribes, **Wohrman**, created sham invoices purporting to document the number of "marketing hours" AHS spent and submitted them to Co-Conspirator 1. These invoices were false in that the

payments from Co-Conspirator 1 were actually tied to the number of genetic specimens and doctors' orders AHS submitted to the laboratories yet were made to appear as though AHS was being paid an hourly fee for its marketing efforts.

13. Shortly after entering into the agreement with Co-Conspirator 1, **Wohrman** and Co-Conspirator 2 agreed to modify the terms under which the kickbacks were made. It was agreed that Co-Conspirator 1 would increase the payments to AHS for every kit submitted by $400. AHS would then pay Co-Conspirator 1 personally $400 for each kit. **Wohrman** agreed to this modification because it did not affect AHS' total compensation from Co-Conspirator 1.

14. In or around November 2021, **Wohrman** and Co-Conspirator 2 again modified the agreement with Co-Conspirator 1, in the following manner. Marketing Company A was a company that provided services similar to AHS, that is, it marketed genetic testing to Medicare beneficiaries. **Wohrman**, Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3, the CEO of Marketing Company A, agreed that Marketing Company A would call Medicare beneficiaries and refer them to Telemedicine Company 1 in a manner similar to AHS. If Marketing Company A obtained a genetic specimen from the beneficiary and a completed doctor's order, it would submit the completed kits to Co-Conspirator-1's laboratories, which would bill Medicare for the genetic testing. The parties further agreed that AHS would be paid a kickback by Co-Conspirator 1 for every kit submitted by Marketing Company A in this manner; after deducting a payment

for itself, AHS would then pass along a portion of the kickback to Marketing Company A.

15. From in or around November 2020, and continuing through in or around April 2022, laboratories controlled by Co-Conspirator 1 paid kickbacks and bribes to AHS in exchange for genetic specimens and completed doctors' orders and caused the submission of claims to Medicare in the amount of approximately $398 million. Medicare paid Co-Conspirator 1's laboratories approximately $57 million for these claims.

16. From in or around November 2020 through in or around April 2022, Co-Conspirator 1, through the laboratories Co-Conspirator 1 controlled, paid at least $23 million in kickbacks and bribes to AHS.

17. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Dallas Division of the Northern District of Texas and elsewhere, the following overt acts:

　a. The submission of genetic specimens and completed doctors' orders to laboratories controlled by Co-Conspirator 1, which were located in the Northern District of Texas.

　b. Discussed, in oral and text conversations, the payment of kickbacks and bribes in exchange for genetic specimens and completed doctors' orders.

　c. On or about October 14, 2021, the payment of a $430,100 kickback and bribe from the x6498 account to the AHS x6377 account.

  d. On or about October 21, 2021, the payment of a $733,100 kickback and bribe from the x6498 account to the AHS x6377 account.

  e. On or about October 28, 2021, the payment of a $443,800 kickback and bribe from the x6498 account to the AHS x6377 account.

  f. On or about November 12, 2021, the payment of a $860,200 kickback and bribe from the x2168 account to the AHS x6377 account.

  g. On or about December 23, 2021, the payment of a $833,500 kickback and bribe from the x2168 account to the AHS x6377 account.

  h. On or about December 30, 2021, the payment of a $668,200 kickback and bribe from the x2168 account to the AHS x6377 account.

AGREED TO AND STIPULATED on this 5th day of July, 2022.

CHAD MEACHAM
UNITED STATES ATTORNEY

LORINDA I. LARYEA
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

*R Scott Wohrman*
SCOTT WOHRMAN
Defendant

*Gary A. Winters*
JASON D. JONES
GARY A. WINTERS
RAYMOND E. BECKERING III
Trial Attorneys
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: 202-203-0040
Email: Jason.Jones5@usdoj.gov

*Michael Hursey*
PAUL MOLLE
MICHAEL HURSEY
Attorneys for Defendant

*Tiffany Eggers*
TIFFANY EGGERS